|   |   |   |
|---|---|---|
| 1 | | HONORABLE RONALD B. LEIGHTON |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| UNITED STATES OF AMERICA, | CASE NO. 12-cr-5170-RBL |
|---|---|
| Plaintiff, | ORDER DENYING MOTION TO SUPPRESS EVIDENCE |
| v. | |
| THERRON D. PITTMAN, | [Dkt. # 44] |
| Defendant. | |

THIS MATTER is before the Court on Defendant Pittman's Motion to Suppress Evidence Pursuant to an Unlawful Search Warrant [Dkt. #43]. Pittman is charged with delivery of a controlled substance[1] and unlawful position of a firearm.[2] Officers obtained a warrant to search Pittman's home and vehicles for evidence relating to a shooting. Pittman argues that the evidence should be suppressed, claiming that the warrant was not based on probable cause. Additionally, he claims that a *Franks* hearing is necessary, arguing that Detective Swanson intentionally omitted exculpatory evidence. Following the *Franks* hearing as requested by defendant [Dkt. #43] the Court **DENIES** the Motion to Suppress.

---

[1] 21 U.S.C. §§ 841(a)(1), (b)(1)(C).
[2] 18 U.S.C. 921(g).

## I. BACKGROUND

### A. Factual Allegations

On October 30, 2011, Shaun Wilson was shot in the upper thigh outside of Portland, Oregon. (Warrant, Dkt. #47, Exh. 1 at 4.) A night club surveillance video caught much of the shooting on camera, but the officers did not view the video until almost a week after the shooting. (*Id*. at 6.) According to video surveillance, Pittman arrived at the Café del Toro at 1:26 am on October 30th with two unidentified females. (*Id*. at 7.) At 2:03, Wilson entered the café. (*Id*.) Pittman approached Wilson and grabbed his hat, throwing it behind the bar. (*Id*.) The two conversed, and it appeared that the conversation became "heated." (*Id*.)

At 2:31, it appeared that an unidentified person "held Wilson back" and attempted to diffuse the conversation. (*Id*.) Wilson and Pittman exited the bar, and Monique Salmon and two other men followed. (*Id*.) The group congregated in front of the Anchor Bar at 2:33, and an argument erupted between Pittman and one of the unidentified men. (*Id*.) Wilson attempted to break up the fight, and the group separated. (*Id*.) Pittman backed against the wall, removed his jacket, and continued arguing with Wilson or another unidentified man. (*Id*.) A flash came from Pittman in the direction of Wilson. (*Id*.) Immediately after the flash, all of the witnesses scattered. (*Id*.) Wilson bent over a pole holding his upper left thigh. (*Id*.) Pittman grabbed his jacket and then walked back towards the Café del Toro. (*Id*.)

Almost immediately after the shooting, Detective Swenson interviewed Wilson at the hospital. (*Id*. at 4.) Wilson claimed that he was shot while trying to break up a fight between two unknown people and that one of them fired several rounds into the ground. (*Id*.) He said that he did not know the identity of the person who fired the shots. (*Id*.) He claimed that the shooting was related to signing of a new artist for his music company, not his gang history. (*Id*.) He

indicated that he had not seen a gun and that he believed he was caught by a ricochet fragment from a round hitting the ground. (*Id.*) Through his conversation with Wilson, Detective Swenson determined that it was unlikely Wilson would cooperate with the investigation. (*Id.*)

Doctors at the hospital confirmed that the wound was likely a gunshot wound and explained that it went through the upper left thigh, leaving no fragments or projectiles inside the wound. (*Id.* at 5.) While at the hospital, Detective Swenson also interviewed Monique Salmon, a witness, and Natey Ayarabil; both Wilson associates. (*Id.*) Salmon informed him that she wanted to help, but did not want to discuss the incident at the hospital. (*Id.*) She explained that she was part of Wilson's music business and that the gathering that night was a celebration for a new artist. (*Id.*) She declined to discuss the incident, explaining "I'm aware of [Wilson's] gang history, and I thought I could handle it." (*Id.*) However, she informed Detective Swenson that there was a shooting and that the video from the bar would reveal everything he needed to know. (*Id.*)

Ayarabil informed Detective Swenson that he was not present at the shooting and was at a different nightclub. (*Id.*) When Detective Swenson pointed out what appeared to be blood on the side of Ayarabil's jeans, Ayarabil explained that it was not blood and that he had run into something. (*Id.*) Detective Swenson found Ayarabil to be guarded about details he was willing to provide and concluded the interview. (*Id.*)

At 5:00 am, Detective Burkeen, who had been investigating the crime scene, interviewed Wilson again. (*Id.* at 5–6.) Wilson repeated that he had been attempting to break up a fight when he heard the gunshots and realized he was hit in the leg. (*Id.* at 6.) He claimed that the shooting was unintentional and refused to identify the persons involved. (*Id.*)

On November 1st, Detective Burkeen received an anonymous tip identifying the shooter as "Snap." (*Id.*) The tip said that "Snap's" birthday is November 12th. (*Id.*) The tip described "Snap" as a black male, 37 to 38 years old, bald, with dark skin and a broad build. (*Id.*) The tip described "Snap's" car as an old Chevrolet Bronco, which is black on the bottom and red on the top. (*Id.*) The tip said that "Snap" lives in Vancouver and frequents the Café del Toro. (*Id.*) It said "Snap" was a known drug dealer who often comes to Café del Toro right before last call. (*Id.*)

Detective Burkeen contacted Detective Swenson, who identified "Snap" as Pittman and sent Detective Burkeen a photograph of him. (*Id.*) Based on his experience in prior investigations Detective Burkeen knew that Pittman is an admitted "blood" gang member with a violent history and a distributor of crack cocaine. (*Id.* at 8.)

On November 4th, Detective Burkeen watched the surveillance footage from the night of the shooting and identified Pittman in the footage. (*Id.* at 6.)

On December 7th, Detective Swenson conducted physical surveillance of Pittman's residence and observed two vehicles in the driveway: (1) a Lincoln Navigator and (2) a Ford Bronco. (*Id.* at 8.) Detective Swenson ran a criminal history check on Pittman that showed multiple felonies, including convictions for robberies, attempting to evade officers, aggravated burglary, unlawful possession of firearms, and felony burglary—which precluded Pittman from possessing a firearm. (*Id.*)

On December 8th, Detective Swenson conducted another physical surveillance of Pittman's residence and observed a red 1989 Chevrolet Suburban. (*Id.*) That same night, Detective Swenson conducted a "Surveillance follow" and watched Pittman until he returned home. (*Id.*)

### B. Warrant

The factual allegations above are based on the warrant affidavit. A Clark County Judge signed the warrant on December 13th, authorizing the search of Pittman's vehicles and residence for evidence related to the crimes of Attempted Murder, Unlawful Use of a Weapon, and Felon in Possession of a Firearm. (*Id*. at 9.)

The affidavit did not mention that Salmon was shown a photo lineup that included Pittman and that Salmon failed to identify any shooter. (Mot. to Suppress at 2.) The affidavit also omitted that a witness heard Wilson threaten Pittman prior to the shooting. (*Id*. at 3.) Finally, the affidavit did not state that, on November 20th, Pittman was stopped for a traffic violation and frisked for a gun. (*Id*.) Officers did not find a gun. (*Id*.)

The warrant was executed on December 15th. Officers discovered a Glock 9mm pistol, magazines and ammunition for the Glock, $3,000 in cash, and twenty five grams of cocaine. Officers did not find the .45 caliber handgun specifically mentioned in the warrant but they found .45 caliber ammunition.

### C. Pittman's Claims

Pittman now seeks suppression of the evidence, arguing (1) that the warrant was not based on probable cause and (2) that the three omissions in the warrant affidavit require a *Franks* hearing because they are material. Pittman specifically argues that the warrant was not based on probable cause because (1) the Government did not describe the reliability of the anonymous tip in the affidavit; (2) the video does not show Pittman with a gun; and (2) if the information established probable cause at one time, it was stale when the warrant was executed.

The Government responds that (1) the caller's tip was corroborated by the security video, and it was detailed and accurate; (2) the video showed what appeared to be a muzzled flash from

Pittman, followed by the victim grabbing his injured leg and the crowd dispersing; and (3) the information was only six weeks old, and because Pittman is a known drug dealer, it was reasonable for police to think that the gun could be in his house. The government also argues that, even if there was not probable cause, the Court should apply the good faith exception.

The Government also argues that a *Franks* hearing is not necessary because (1) the fact that one uncooperative witness did not identify Pittman does not negate the substantial probable cause established by the video, the tip, and other information; (2) the information that Wilson threatened Pittman actually bolsters probable cause; and (3) the fact that Pittman was unarmed during a traffic stop has nothing to do with whether he would have guns in his residence or vehicle.

## II.  DISUCSSION

A search warrant affidavit must be supported by probable cause, that is, a "'fair probability that contraband or evidence of a crime will be found in a particular place' based on the totality of the circumstances." *Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir. 2006) *quoting Illinois v. Gates*, 462 U.S. 213, 238 (1983). The "validity of a search warrant depends on the sufficiency of what is found within the four corners of the underlying affidavit." *United States v. Taylor*, 716 F.2d 701, 705 (9th Cir. 1983). The affidavit must establish probable cause to believe that contraband or evidence will be found at the place to be searched. Fed. R. Crim P. 41. In examining a search, courts "examine the 'totality of the circumstances' in a 'common-sense' manner." *United States v. Mayer*, 560 F.3d 948, 956 (9th Cir. 2009), *citing United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007). The issuing judge's finding of probable cause is entitled to great deference. *United States v. Terry*, 911 F.2d 272, 275 (9th Cir. 1990). The affidavit need only establish "a reasonable nexus between the activities supporting

probable cause and the locations to be searched." *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991). "In making this determination, the [issuing judge] may rely on the conclusions of experienced police officers regarding where evidence is likely to be found." *Id*.

The affidavit met the modest standard of probable cause. There is no question a crime was committed. The anonymous caller provided extremely detailed information and effectively identified Pittman as the shooter. The security videos showed a running argument between Pittman and Sean Wilson that appeared to culminate with Pittman shooting Sean Wilson. Pittman does not challenge the accuracy of any of that information. The anonymous caller's information coupled with the video tape provides reliable, irrefutable evidence of a crime that was committed by Mr. Pittman.

As for defendant's staleness argument, the Ninth Circuit and other courts have repeatedly ruled that information in firearms investigations does not become stale that quickly. *United States v. Collins*, 61 F.3d 1379, 1384-85 (9th Cir. 1995). The case law recognizes the fact that firearms "are durable goods useful to their owners for long periods of time." *United States v. Singer*, 943 F.2d 758, 763 (7th Cir. 1981). The affidavit explained that Pittman, as a person involved in gang activity and drug dealing, was especially likely to have a gun. There was probable cause to believe that, even if Pittman had disposed of the gun, this kind of evidence would still be found in his house (as it was, in the form of .45 caliber ammunition). The Search Warrant in this case authorized the police to search for ammunition, magazines, holsters, gun cleaning equipment, receipts, owner's manuals, or other firearm accessories that could have connected Pittman to the shooting.

Finally, the Search Warrant is subject to a deferential standard given that an objective magistrate weighed the information in the affidavit and found probable cause to authorize the

search. In *United States v. Leon*, 468 U.S. 897 (1984) the Supreme Court held that evidence should not be excluded if officers acted in reasonable reliance on a warrant, later found to be invalid, issued by a detached and neutral magistrate. Ninth Circuit cases have distinguished "facially deficient" search warrants and have declined to apply the *Leon* exception to them. *Center Art Galleries-Hawaii, Inc. v. United States*, 875 F.2d 747 (9th Cir. 1989). However, in the case of warrants appearing valid on their face, but lacking a sufficient affidavit, the circuit has applied *Leon* unless the affidavit is a "bare bones" affidavit. *See United States v. Michaelian*, 803 F.2d 1042, 1046-48 (9th Cir. 1986).

Here the affidavit is sufficiently detailed and sufficiently particularized that the warrant is supported by probable cause. The omissions in the affidavit raised by the defendant are insignificant in the totality of circumstances. The lack of cooperation from eyewitnesses was not surprising or in any way remarkable. The threat by the victim against the defendant does nothing but bolster the argument that the defendant was the shooter, and the staleness argument is without merit. The officers' fruitless "pat down" of Pittman on another occasion does not diminish the reality of the information about the October 30, 2011 crime.

The Motion to Suppress Evidence [Dkt. #44] is **DENIED**.

Dated this 2nd day of January, 2013.

_____
Ronald B. Leighton
United States District Judge